Chamberlain *v.* Harrod.

CHAMBERLAIN *vs.* HARROD.

The purchase of a ship, in a foreign port, by the master, is generally to be considered as made for the benefit of the owners, if they elect so to regard it.

THIS was *assumpsit* for one fourth part of the earnings of the brig *Levant*, and for one fourth part of her value; with a count for money had and received.

The plaintiff owned one fourth of the brig, of which the defendant was master; the other three fourths belonging to *Theophilus Sanborn*. On the 9th of *August*, 1819, the plaintiff, being indebted to *Winslow Lewis & Co.* of *Boston* in $555 73, for cordage and ship chandlery for his part of the vessel, gave them his two promissory notes, payable at six and twelve months; to secure the payment of which, on the 25th of *November* following, he gave them a bond creating a lien on his quarter of the brig, and empowering them, in default of payment, to take possession of, and sell his part of the vessel, to raise the money to pay the notes.

Chamberlain *v.* Harrod.

The vessel, having been sent on a freighting voyage, arrived at *Philadelphia* from *New Orleans* early in *April* 1821; and was immediately advertised to sail again for the latter port on the 12th. On the 16th of *April*, *W. Lewis & Co.* having heard of her arrival, wrote to *C. Hathaway & Co.* their correspondents in *Philadelphia*, inclosing an order on the defendant for one fourth part of the earnings of the brig, and requesting a copy of her accounts. On the same day they wrote to the defendant on the same subject; and observed that presuming she had done well, they were willing she should go once more to *New Orleans*, before a sale of her was made. In the mean time the defendant had appointed, as agents and consignees of the vessel, *Lewis, Haven & Co.* merchants in *Philadelphia*; who had received her freight money for the last voyage, amounting to $1924 68; and had paid his draft of $1136 58, on them in favor of a house in *New Orleans*, on account of the owners; and disbursed for him, up to the 14th of *May*, $1435, to fit her for the voyage hereafter mentioned; leaving due to them a balance of $646 90. *Hathaway & Co.* were unable to communicate with the defendant till *April* 26, on which day he wrote to *W. Lewis & Co.* acknowledging the receipt of their letter of the 16th, and stating that when he was about to sail for *New Orleans* agreeably to his advertisment, without freight, he had accepted an offer of a charter of the vessel for *South America*, on a voyage which would not be less than eight months, and might be twelve, if, as was contemplated, the brig should go to the *Mediterranean*;—that the charter and loading commenced that day, the vessel having that morning come from the carpenter's hands;—that he should close and forward the accounts as soon as possible;—that on the arrival of the brig at *Philadelphia*, there were about $800 due her;—that Capt. *Sanborn* had drawn $1200 from him at *New Orleans*, which he presumed was on account of the owners of the vessel, according to their interest in her, &c. On the following day, being *April* 27th, the vessel was chartered by the defendant to *Richard Bayley*, for a voyage to *South America, Europe*. and back to the *United States*; the charterer stipulating that the defendant should command her. On the 1st of *May*, *W. Lewis & Co.*

replied to the defendant's letter of *April* 26, refusing any consent to the proposed voyage, and insisting on payment of their debt ; stating that they would sell the plaintiff's quarter part for $1500 at credit ; or would assign to the defendant, the charterer, or any one else, their notes and bond with a policy of $1600 on the vessel from *Dec.* 10, 1820, to *Dec.* 10, 1821, for an approved draft at four months ; with liberty to withhold one fourth of the charter till they were reimbursed ; and that if neither of these was done, they should stop the vessel ; referring him to their correspondents *C. Hathaway & Co.* ; to whom they wrote on the same day to the same effect, annexing a statement of their demands, and requesting them, if the debt was not secured or paid in one of those modes, to hand the demands to an attorney, and cause the vessel to be attached. This letter was followed by the transmission of the bond, to which a power of attorney was subjoined from *W. Lewis & Co.* to *C. Hathaway*, dated *May* 8, authorising him to recover and receive the amount of the debt, and, if need be, to take possession of, and sell the plaintiff's quarter part of the brig, and to do all which the constituents could do concerning their claim.

The vessel being laden, and ready for sea, the plaintiff's interest in her was attached at the suit of *W. Lewis & Co.* ; and after a few days detention, on the 14th of *May, Bayley*, the charterer, paid the amount of their debt, and took from *Hathaway* an assignment of the notes and bond to himself ; by virtue of which he on the same day conveyed the plaintiff's fourth part of the brig to the defendant, for the consideration of 800 dollars. The defendant on the same day bottomed one quarter of the brig to *Lewis, Haven & Co.* for $779. 60, being the amount paid by *Bayley* to relieve the vessel from the attachment, adding the plaintiff's quarter part of the disbursements made to the vessel in *Philadelphia* ; and on the same day drew on the plaintiff at forty days after date, in their favor, that being the longest time they said they would allow, for $821.63, being the sum abovementioned, with interest and costs ; taking their obligation, that on payment of the draft by the plaintiff, at its maturity, they would cancel the bond, and convey the fourth part of the vessel again to him, by virtue of a power of attorney, left with them by the defendant for

Chamberlain v. Harrod.

that purpose. All these arrangements were made by advice of coun-
sel, to enable the defendant to raise the money on bottomry of the
brig.

On the same day the defendant addressed a letter to the plaintiff,
stating that he had become the purchaser of one quarter of the brig
for 800 dollars, and offering to retransfer it to the plaintiff, on pay-
ment of the draft. This draft was accepted by the plaintiff on the
sixth of *June*, but was never paid.

Insurance was effected by *Lewis, Haven & Co.* to cover their ad-
vances on the bottomry bond of the defendant; which the defendant
paid to them, about ten months afterwards, on the return of the vessel.

Upon these facts a verdict was returned by consent for the plain-
tiff; the parties agreeing that if the court should be of opinion that
the action was maintained, the extent of the defendant's liability should
be ascertained by assessors, to be appointed by the court, and the ver-
dict be amended according to their report; but if not, or if nothing
should be found due to the plaintiff, the verdict should be set aside,
and a nonsuit entered.

*Allen*, for the defendant, insisted that the sale of the vessel
was valid, vesting the property absolutely in him; and that there-
fore he was not accountable to the plaintiff, either for her value,
or her earnings. The employment of the vessel, in the manner the
defendant employed her, was assented to by *Sanborn*, the major
owner; which rendered the consent of the plaintiff, or his dissent, of
no importance. If the plaintiff would have protected his interest, he
should have pursued the course provided in the admiralty, in cases of
recusant owners. *Abbot on Shipping*, 84—86. 106. The defend-
ant therefore was fully authorized to make the contract which he
made with *Bayley*, for the charter of the vessel, involving the neces-
sity of repairs so extensive as to absorb all the funds in his hands, the
vessel being a freighting ship, and no better offer presenting. *Abbot*,
113. 132. He was not bound to retain sufficient funds to discharge
the lien which the plaintiff had created on his part of the vessel; it
being no part of his general duty as master; and if it were, yet here

Chamberlain *v.* Harrod.

he had no knowledge of the fact. All the consequences of this want of notice to the defendant are chargeable to the plaintiff alone.

The master is not to be considered as the general agent of the owners, while his ship is in a domestic port, and within their reach, as was the case here. This agency arises only from necessity, and ceases with the necessity which created it. He was therefore, in the present case, at liberty to act for himself. The relation, moreover, of master and owner was dissolved, as between him and the plaintiff, by the sale of the vessel to *Bayley ;* and this too, by the plaintiff's own act, the power to sell having emanated from himself. But if it had then subsisted, it would not have authorized the defendant to bind his owner by a purchase of this kind. *Oliver v. The Newburyport Ins. Co.* 3. *Mass.* 51. *Sawyer v. Maine F. & Mar. Ins. Co.* 12. *Mass.* 291. Had the vessel been lost, the defendant must have sustained the loss alone ; and the plaintiff, therefore, ought not to participate in the gain. *Appleton v. Crowninshield* 3. *Mass.* 443. 8. *Mass.* 483.

But if the plaintiff was at liberty to claim the benefit of the defendant's purchase, or not, at his election, yet he was bound first to refund the money paid by the defendant, which he has never yet done ; and to make his election afterwards, in a reasonable time. 5. *Dane's Abr.* 177. 188.

*Greenleaf* and *Williamson,* for the plaintiff, to the point that the case fell within the general authority of the master, cited *Marshall on Ins.* 500. *Abbot,* 132. 273. *Douglas v. Moody & al.* 9. *Mass.* 551. *Dodge v. The Union Ins. Co.* 17. *Mass.* 471. *McMasters v. Shoolbred* 1. *Esp.* 237. *Milles v. Fletcher Doug.* 230.—And they insisted that a shipmaster, being in fact a trustee of the property confided to him, could not become the purchaser of that property for his own benefit. In equity this is the general rule. *Campbell v. Walker* 5. *Ves.* 678. 13. *Ves.* 601. *Ex parte Lacy* 6. *Ves.* 627. *Ex parte Bennett* 10. *Ves.* 393. 2. *Roberts on Wills, app.* 6, note. 1. *Sch. & Lefr.* 379. *Atto. Gen. v. Ld. Dudley,* Cooper 146. 2. *Mason,* 533. If the purchase is ever permitted to stand, the trustee is holden to account for the profits ;—*Whitecote v. Lawrence & al.* 3. *Ves.*

Chamberlain v. Harrod.

740 ; and the property may be resold, at the option of *cestui que trust*. *Lister v. Lister* 6. *Ves.* 631. And these principles are recognized in trusts arising under the marine law. *Barker v. Mar. Ins. Co.* 2. *Mason* 369. *Church v. Mar. Ins. Co.* 1. *Mason* 344. *Hayman v. Molton & al.* 5. *Esp.* 65. 68. *note.*

They further contended that the extensive repairs put on the vessel at *Philadelphia*, to fit her for so long a voyage, were not imposed by any urgency of the case, nor necessary for the regular employment of the ship ; and that therefore the defendant was justly responsible for the consequences of such dissipation of the funds in his hands. 1 *Johns.* 106. *Laws of the Hanse towns, Art.* 3. 1. *Pet. Adm. app.* 97. *The Aurora* 1. *Wheat.* 96. But if such repairs were necessary, they might have been paid for out of the freight money remaining in the defendant's hands ;—*Lane v. Penniman & tr.* 4. *Mass.* 91 ; or funds might have been raised on the credit of future freights, by way of *respondentia* ;—1. *Wheat.* 96—or, by hypothecation of the vessel. *Hussey v. Christie & al.* 9. *East* 426. *Abbot,* 151. *note. Laws of Wisbuy, Art.* 45. 65. *Laws of Hanse towns Art.* 60. 9. *Johns.* 29. 1. *Pet. Adm.* 37. *Ib. app.* 88. 111. And for this purpose *Philadelphia* may be regarded as a foreign port, the owner being resident in *Maine* ; as an Irish port, or a port in the island of *Jersey,* is to a resident in England. *Menetone v. Gibbons Abbot* 171. 4. *Rob. Adm.* 1. *Jacobsen's Sea laws,* 363.

Lastly, they argued that the defendant had derived no title to the plaintiff's part of the vessel, the bill of sale not being made in the name of the principal, but of *Bayley,* who acted under a power from *Hathaway* ; and that the authority of the latter did not extend beyond the collection of the debt, unless a sale could be effected for fifteen hundred dollars. Nor had he any thing more than a mere personal trust, without the power of substitution.

The opinion of the Court was afterwards read, as drawn up by

WESTON J. The question presented is, whether the defendant is or is not chargeable, upon the evidence detailed in the case before us. The vessel, the fourth part of which is in controversy, had been a voyage to *New Orleans,* had sailed thence to *Philadelphia,* and

54

was again destined by the owners to take freight for the former port; in regard to which the defendant, as master, had been advised and directed.   At what time in the month of *April*, 1821, she arrived at *Philadelphia* does not appear; but it must have been early in the month; as she was advertised again to sail for *New Orleans*, on the twelfth.   By the letter of the defendant of the twenty-sixth of the same month to *Winslow Lewis & Co.* it appears that he was advised, on his arrival at *Philadelphia*, that they were the agents of the plaintiff; but notwithstanding the charter party had then been agreed on, although not formally executed, long enough to have the repairs completed, as the letter states that the vessel had come from the carpenter's hands, and had commenced loading the morning of its date, that letter contains the first information to *Lewis & Co.* of the charter he had accepted, and of the entire change in the destination of the vessel.   He does not profess to have had authority from either of the owners for this measure; stating that he did not know whether they would like it; but presumed to enter into the contract, as he could not avail himself of their advice.   By the course of the mails, an answer to a letter from *Philadelphia* to *Boston* might be received in a week from its date, at *Philadelphia*.   If a delay for this short period might have defeated the agreement, it was at least the duty of the defendant to have given to *Lewis & Co.* the earliest advices of what had been agreed. But this he neglected to do, until, from the intervention of their agents at *Philadelphia*, he must have been aware that they would learn from them what had been done, if he not furnish the information himself.   The net freight earned by the vessel from *New Orleans* to *Philadelphia*, as appears by *Haven's* deposition, exceeded nineteen hundred dollars.   In the defendant's letter before alluded to, it is stated that Capt. *Sanborn* had drawn twelve hundred dollars of the freight earned, in behalf, it must be presumed, of his relative, the owner of three fourths of the vessel, and had directed him to take the orders of *Lewis & Co.* as to the disposition of the plaintiff's part of the freight.   For this part *Lewis & Co.* had drawn on the defendant; with the receipt of which they would have been satisfied. The course pursued by the defendant, was not only a different one from that ordered by the owners; but *Lewis & Co.* by their letter

Chamberlain *v.* Harrod.

to the defendant of *May* first, protested against the measure, unless their demand was paid. Under these circumstances, nothing short of the positive direction of the major owner could have justified the defendant; and no such direction is in evidence, or pretended in the case. *Lewis & Co.* finding themselves disappointed in the expectation of receiving the plaintiff's proportion of the earnings of the vessel, the preceding voyage, determined to take measures through their agents at *Philadelphia*, for the collection of their demand.

The transfer to and by *Bayley*, and the title of the defendant derived therefrom, depended upon the bond given by the plaintiff to *Lewis & Co.* and upon their authority to *Hathaway & Co.* dated *May* first. By the power, *Hathaway* was to demand, and by legal means to recover and receive, the amount of the two notes mentioned in the bottomry, and, if need be, to take possession of and to sell the quarter part of the brig. This gave him no authority to assign and transfer the instruments; that was derived from the letter of instructions, and was to be done for a specific purpose. By these instructions, if he sold, it was not to be for a less sum than fifteen hundred dollars; but as this limitation does not appear in the power, the title of a purchaser under it, without notice of the limitation, would be unaffected by it. But the agent did not sell the brig. The power therefore may be laid out of the case; as he did not act under that instrument. He sold and assigned the bond and the notes. Under what circumstances was he authorized to do this? A part of the letter of *Lewis & Co.* of *May* first, will determine this question. It is in these words : " Capt. *Harrod,* the charterer, or any one else, who may be disposed to advance the amount of the annexed demand, shall have for their security the bottomry bond, which we will warrant and defend, and the policy of insurance on said quarter, say sixteen hundred dollars, from the tenth of *December*, 1820, to the tenth of *December*, 1821, at noon, at sea or in port, and they shall withhold one fourth part of the charter of said brig, until they are fully reimbursed." *Lewis & Co.* were unwilling to sacrifice the interest of the plaintiff; and they guarded against it. The agent must have assigned in the faith that these terms would be complied with. *Bayley* declined making the advances, and giving credit therefor,

Chamberlain *v.* Harrod.

But the defendant, under the advice of counsel, took a transfer of the fourth part of the brig, for the express purpose of acquiring authority to raise the necessary funds, by a bottomry, to be executed by himself. The assignment to *Bayley*, the payment by him to the attorney of *Lewis & Co.* the sale by *Bayley* to the defendant, and the acknowledgement of *Lewis, Haven & Co.* of the receipt of a bottomry bond from him, all bear date on the same day.

In *Church v. The Marine Ins. Co.* 1. *Mason* 344. *Story J.* expresses a strong doubt whether the master, even at a judicial sale, can purchase on his own account ; but he is very clear that he cannot purchase for his own benefit, at a sale which he has had any agency in directing.

There is no evidence that *Lewis, Haven & Co.* were pressing for their advances, on account of the repairs ; or that they would have have interposed any obstacle to the sailing of the vessel. For advancing the sum, necessary to liberate her from attachment, they could have taken an assignment of the bottomry, given by the plaintiff to *W. Lewis & Co.* to be held until reimbursed by the charter ; which would have been in accordance with the instructions of *W. Lewis & Co.* to their agents. They might have been, however, unwilling to do this, unless their previous advances were also included in the bond ; and the course pursued by the defendant might have been deemed by him, until he thought proper to set up an adverse and independent title of his own, to be in furtherance of the plaintiff's interest ; the vessel being thus relieved from detention, and placed in a condition to prosecute a voyage, believed to be beneficial to the owners. In point of fact, nothing was raised from the defendant's funds ; *Lewis, Haven & Co.* not being paid until after the return of the vessel ; when the fourth part of her earnings, she having been on charter between ten and eleven months, was sufficient for their reimbursement.

If, in these proceedings, the defendant contemplated a benefit to himself, at the expense of the plaintiff, and that from a necessity which he had created without authority ; it would be a violation of duty to the plaintiff, inconsistent with the relation existing between

Chamberlain *v.* Barrod.

them, and with the terms under which *W. Lewis & Co.* would agree to assign their securities, of which he was fully informed.

There are two grounds, upon which the defendant may be considered as having purchased in trust for the plaintiff, at his election. In the first place, a purchase by the master is generally to be considered as made for the benefit of the owners, if they determine so to regard it. This principle is recognized by some of the authorities cited in this cause; and arises from the relations of trust and confidence, which exist between the parties. In the second place, he may be presumed to have assented to purchase on account of the plaintiff. He knew that *Hathaway & Co.* were authorized to assign the instruments only as collateral security, to be held until the earnings of the fourth part of the brig might reimburse the advances made. His offer to reconvey to the plaintiff, shows also that he considered himself as acting in his behalf. The election of the plaintiff to regard the purchase of the defendant as having been made in trust for him, is evinced as well by his acceptance of the defendant's draft, as by his bringing this action. The failure of the plaintiff to pay that draft, did not deprive him of his interest in the vessel, or justify the defendant in claiming to hold it thereafter in his own right. *Haven,* in his deposition, says that forty days was the period limited in the defendant's draft, by the direction of his house, as the longest to which they would accede. It is not easy to perceive the necessity for this limitation. The term of credit given by them to the defendant on his bond, does not appear. They caused, however, their bottomry interest to be insured, and received the amount from the defendant on the return of the vessel; and it may be presumed that payment on her return was originally stipulated. If we are to understand the forty days, as the longest period within which they would be satisfied to receive their advances and cancel their bond, without exacting marine interest, it could certainly have been of no importance to them by whose hand the bond might subsequently be paid. Their bottomry and insurance was ample security to them; and they were in fact paid from the subsequent earnings of the plaintiff's fourth part, under the charter party. If the defendant purchased in trust, as he must under the circumstances be held to have done, it does

Dover *v.* Paris.

not appear that he has at any time made any advances whatever from his own funds; the fourth part of the charter, on the voyage he performed, exceeding the amount of the bottomry by him executed. There was no occason then for the restricted period of forty days within which to hold the plaintiff to make payment, under the penalty of forfeiting his interest. There is no evidence, that when the defendant finally paid the bond, there was any deficiency in the earnings of the vessel, which might render it necessary for him to draw on the plaintiff for any sum whatever.

The opinion of the court is, that the defendant is by law accountable to the plaintiff for the earnings of the fourth part of the brig *Levant*, he being allowed for the amount of the bottomry bond to *Lewis, Haven & Co.* and for all necessary charges and disbursements; that assessors be appointed to liquidate the amount; and that the verdict be amended according to their award.